UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
In re:                                                  Case No.: 1-09-41966-dem

DIAL-A-MATTRESS OPERATING CORP.,                        Chapter 11

               Debtor.                                  (Jointly Administered)
-------------------------------------------------------x

1-800-MATTRESS CORP.,                                   Case No.: 1-09-42201-dem

               Debtor.
-------------------------------------------------------x

DIAL-A-MATTRESS INTERNATIONAL LTD.,                     Case No.: 1-09-42203-dem

               Debtor.
-------------------------------------------------------x

## DECISION ON DEBTORS' MOTION TO SELL
## SUBSTANTIALLY ALL OF ITS ASSETS UNDER 11 U.S.C. § 363

Appearances:

Marc L. Hamroff, Esq.
Theresa A. Driscoll, Esq
Moritt Hock Hamroff & Horowitz, LLP
Attorneys for Debtors and Debtors-in-Possession
400 Garden City Plaza
Garden City, New York 11530

Thomas Draghi, Esq
Westerman Ball Ederer Miller & Sharfstein, LLP
Attorneys for Official Committee of Unsecured Creditors
1700 Old Country Road
Mineola, New York 11530

Gerard S. Catalanello, Esq.
James J. Vincequerra, Esq
Duane Morris LLP
Counsel to Newco Trading LLC
1540 Broadway
New York, NY 10036-40861


Steven Wilamowsky, Esq.

Bingham McCuthchen LLP
399 Park Avenue
New York, NY 100222-4689
    -and-
John R. Skelton, Esq.
Bingham McCutchen LLP
One Federal Street
Boston, Massachusetts 02110
Attorneys for Consolidated Mattress Company, Inc.
and Amalgamated Mattress Co., Inc.

William Curtin, Esq.
Office of the United States Trustee
271 Cadman Plaza East
Brooklyn, New York 11201

DENNIS E. MILTON
United States Bankruptcy Judge

## I. INTRODUCTION

Dial-A-Mattress Operating Corp. d/b/a 1800Mattress.com and d/b/a 1800Mattress, ("Dial" and "debtors") seek the Court's granting approval of its Motion for an Order (i) approving the sale of substantially all of the debtors' assets free and clear of liens, claims, encumbrances and other interests; (ii) authorizing the assumption and assignment and/or rejection of certain executory contracts and unexpired leases; and (iii) granting related relief (the "Sale Motion"). The Court hereby grants the approval of debtors' Sale Motion to Newco Trading LLC ("Newco") as the highest and best offer. The Court directs counsel for the debtors to submit an Order consistent with this Decision and providing for the applicable stay under Bankruptcy Rules 6004(h) and 6006(d).

## II. JURISDICTION

This Court has jurisdiction over this core proceeding under 28 U.S.C. §§ 1334(b) and 157(b)(2) and the Eastern District of New York standing order of reference dated August 28, 1986. This Decision and Order constitutes the Court's findings of fact and conclusions of law to the extent required by Fed. R. Bankr. P. 7052.

## III. FACTUAL BACKGROUND

On March 17, 2009, Blue Bell Mattress Co. d/b/a King Koil Northeast/Comfort Solutions, Sealy, Inc. and 6225 Jericho Turnpike, LLC filed for relief under Chapter 7 of the Bankruptcy Code placing Dial into an involuntary Chapter 7 proceeding pursuant to 11 U.S.C. §§ 303(a) and (b). On March 23, 2009, Dial consented to the entry of an order of relief and filed a separate motion to convert the Chapter 7 case to a case under Chapter 11 pursuant to 11 U.S.C. § 707(b) (the "Voluntary Petition Date"). Dial-A-Mattress International Ltd., ("Dial International") and 1-800-Mattress Corporation ("1-800") each filed voluntary petitions for relief under Chapter 11 of Bankruptcy Code. On March 30, 2009, the Office of the United States Trustee appointed an Official Committee of Unsecured Creditors in these cases (the "Committee").

Dial is a New York Corporation that sells and delivers beds, mattresses and bedding related products via telemarketing, Internet and brick-and-mortar traditional retail. The company began as Dial-A-Mattress Franchise Corporation in 1983 and changed names in 1990. Dial currently maintains and operates various showrooms in New York, New Jersey, Connecticut, Virginia, Maryland, and California. In the months prior to the debtors' filing, they had begun to streamline their operations, closing approximately nineteen showrooms and related

warehouses.  As of the Voluntary Petition Date, the debtors maintained and operated twenty-two showrooms and three warehouses.

In 1991, Dial-A-Mattress International Ltd., ("Dial International"), a Delaware corporation, was formed for the purpose of serving as a tenant in some of the retail stores for Dial as well as facilitating the franchising of the brand.  In December 2004, Dial International expanded its operations by acquiring, through merger, 1-(888) Mattress Franchise Corp. Dial International is also the franchisor under certain Franchise Agreements with Consolidated Mattress Co., Inc. ("Consolidated") and Amalgamated Mattress Co. Inc. ("Amalgamated").

Consolidated and Amalgamated  (collectively the "Consolidated Group") operate the telemarketing business for the debtors in specific territories. Consolidated operates the telemarketing business and fulfills the internet sales in the following exclusive territories: (i) Massachusetts: (Essex, Middlesex, Suffolk, Norfolk, Plymouth, Bristol, Barnstable, Worcester, Dukes, Nantucket, Worcester, Franklin, Hampshire, Hampden and Berkshire; (ii) New Hampshire (Hillsborough, Rockingham,  Stafford); (iii) Vermont (Windham, Bennington, Windsor, Rutland, Addison, Orange, Chittenden, and Washington); (iv) Rhode Island (all counties); (v) New Jersey: (Atlantic, Burlington, Camden, Cape May, Cumberland, Gloucester, Mercer, Salem, Somerset, Hunterdon and Ocean); (vi) Pennsylvania (Berks, Bucks, Chester, Delaware, Lehigh, Montgomery, Northhampton, Philadelphia); and (vii) Delaware (Kent, New Castle). Amalgamated operates the telemarketing and internet businesses in Florida in Charlotte, Collier, Desoto, Glades, Hendry, Lee, Monroe, Dade, Broward, Palm Beach, Martin, St. Lucie, Okeechobee, Indian River, Brevard, Hardee, Flagler, Hernando, Lake, Highlands, Marion, Hillborough, Osceola, Manatee, Orange, Pasco, Seminole, Pinellas, Sumter, Polk, Volusia,

Sarasota, Citrus, Alachua, Baker, Bradford, Clay, Columbia, Duval, Levy, Nassau, Putnam, St. Johns, and Union.

In November 2003, 1-800-Mattress Corporation ("1-800"), a Delaware Corporation was formed, and is the current franchisor entity which sells 1800mattress.com franchises. As of the Voluntary Petition Date, 1-800 had one franchisee, Rectangle Corporation ("Rectangle"), which operated in Connecticut. Rectangle conducts business via telemarketing, the internet and showrooms.

Since the Voluntary Petition Date the debtors have been in possession of their assets and continue to manage their business as debtors and debtors-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108. On March 13, 2009, the debtors executed an Asset Purchase Agreement (the "Purchase Agreement") with Newco, a subsidiary of Sleepy's Holdings, LLC, pursuant to which the Purchaser agreed to purchase substantially all of the assets relating to the debtors' business operations. The consideration to be paid by Newco under the Purchase Agreement was $2.1 million, subject to certain adjustments. By the Order dated March 31, 2009 (the "Sale Procedure Order") the Court approved certain sale and auction procedures including the Purchase Agreement. The Sale Procedures provided in relevant parts:

> **1. Sale Procedure Motion**
>
> ....The sale of the Acquired Assets is subject to approval of the Bankruptcy Court and is subject to higher and better offers...
>
> **2. Right to Negotiate Offers and Determine Highest and Best**

> **Bid**
>
> The Debtors shall have the sole and exclusive right to negotiate any offer (in consultation with the official committee of unsecured creditors appointed in these cases, the "Committee") made for the purchase of the Acquired Assets and to determine the highest and best offer. In evaluating whether a bidder has submitted the highest and best offer, the Debtors may consider, among other things (i) the purchase price proposed in the offer; (ii) the bidder's financial condition and ability to close; (iii) any proposed modification to the terms set forth in the Purchase Agreement; and (iv) the probability that a prompt closing will occur...
>
> **6. Auction Sale**
>
> In the event the Debtors receive one or more Qualified Bids (in addition to the bid of the Purchaser), the Debtors will conduct an auction sale... at which the Purchaser and other parties that have submitted Qualified Bids may participate. Prior to the Auction the Debtors intend to retain an independent professional to facilitate the Auction process...
>
> ...The Auction will commence with the announcement of the highest Qualified Bid, and bidding will proceed in such manner and on such terms as are announced by the Debtors at the time of the Auction. The minimum bidding increment at the Auction shall be **$50,000** (above the Initial Overbid and for all further bids). At the conclusion of the Auction, the Debtors will announce the highest bid... The Debtors and the Committee, may conduct the auction in any manner they believe will be in the best interests of the estate.

Court Order Approving procedures for sale of substantially all of the Debtors' assets; Establishing dates and deadlines for sale process; Approving break-up fee; Approving procedures for resolution of objections to the assumption and assignment of executory contracts and unexpired leases; Approving form and manner of notice and Granting related relief ("Sale Procedures Order"), Exhibit 1 (emphasis in original). In connection with the sale, the debtors also established a Virtual Data Room which enabled interested bidders to review online key data,

contracts, financials and other pertinent information regarding to the Debtors' assets and business operations.

On March 28, 2009, the debtors filed the Sale Motion. Twelve objections were filed in connection to the Sale Motion, including the objection of the Consolidated Group and Rectangle. Rectangle filed a Response and Joinder to the Consolidated Group's Objection.

On May 19, 2009, this Court conducted an evidentiary hearing regarding the estimation of the proposed rejection damages claim of the Consolidated Group and Rectangle (collectively the "Franchisees") should the Franchise Agreements be rejected under the terms of the Sale Motion. Pursuant to the Stipulation between the debtors, the Committee, and the Franchisees, the parties agreed that the rejection damages estimation process was not intended to be an adjudication of: (i) any claims or disputes related to the Franchise Agreements; (ii) the debtor's ability to assume and assign or reject those agreements; or (iii) any rights and claims concerning the post-rejection rights of the Franchisees, the debtors, and other relevant parties. The Consolidated Group and the Committee each submitted an expert report. Counsel for the Consolidated Group made proffers. The Court heard the arguments of counsel. The Court found that for the purposes of providing an estimate of the rejection damages of the Franchisees, the Franchisees had a direct claim against Dial Operating and an intercompany claim against Dial International. The Court set the estimated rejection damages claim of the Franchisees in the aggregate amount of $11.4 million.

On May 26, 2009, the debtors, with the assistance of their Court-retained investment banking firm, Trenwith Group LLC ("Trenwith"), conducted an auction of substantially all of the debtors' assets (the "Auction"). Prior to the Auction, Trenwith published

a notice of sale in the Wall Street Journal on May 7, 2009 and sent approximately four thousand emails to a database of prospective bidders for these kinds of assets. Manning Aff. ¶ 6. Approximately two hundred parties, including financial buyers and strategic investors, were contacted regarding the acquisition of the debtors' assets. A total of sixteen financial investors, twelve strategic investors, and five Carve Out Parties signed Non-Disclosure Agreements and were given access to the debtors' Virtual Data Room. Id.. at ¶ 5 - 7.  There were six bids made by the Bid Deadline of May 21, 2009, and five Qualified Bidders participated in the Auction.  Id. at  ¶ 15.

At the Auction the debtors and the Committee identified four issues that they considered to be especially important in evaluating the highest and best offer in addition to consideration and other relevant components: (1) Providing replacement DIP financing as the existing DIP financing matured on June 3, 2009, (2) Understanding Qualified Bidders intentions surrounding the employees, to wit,  whether the prospective bidders were prepared to offer employment to substantially all the employees of the Debtor, (3) Clarifying the Qualified Bidders intentions to assume or reject the lease for the Long Island City warehouse and headquarters, and (4) Clarifying the Qualified Bidders intentions regarding certain AT&T equipment. See id. at ¶ 18.

There were seven rounds of bidding.  At the conclusion of the Auction, Trenwith recommended the $25 million bid made by Newco (the "Newco Bid") as the highest and best offer for the debtors' assets. Id. at ¶ 20.  The debtors and the Committee supported this recommendation. Id. On May 27, 2009, the debtors filed a Reply of Debtors to Objections to the Sale Motion in which they supported the Newco Bid as the highest and best offer.  The

Committee also filed a statement in support of the Newco Bid and the debtors' Sale Motion on May 27, 2009.

On May 28, 2009, the Court held a hearing regarding the debtors' Sale Motion. The debtors argued that the only remaining objections to the Sale Motion were those of the Franchisees. A representative of the debtors' investment banker, Trenwith, testified to the Auction results and its recommendation of the debtors' Sale Motion. The Committee spoke in support of the debtors' Sale Motion and called a financial expert to testify as to the value of officer loans used in the Auction. Both counsel for the Consolidated Group and Rectangle opposed the Sale Motion. The Consolidated Group offered the testimony of one of its principals about the potential consequences to the Franchisees under the Sale Motion.

## IV. DISCUSSION

### A. The Newco Bid is the highest and best offer

#### 1. The Standard

The business judgment test is the standard for Section 363 asset sales in this Circuit. See Comm. of Equity Holders v. Lionel Corp. (In re Lionel), 722 F.2d 1063 (2d Cir. 1983); In re WestPoint Stevens, Inc., 333 B.R. 30 (Bankr. S.D.N.Y. 2005); In re Chateaugay Corp., 973 F.2d 141, 145 (2d Cir. 1992); In re Ionosphere Clubs, Inc., 184 B.R. 648, 653 (S.D.N.Y. 1995). The standard requires the directors of a corporation to act on an informed basis, in good faith and in the honest belief that the action is in the best interest of the company. In re Integrated Resources, Inc., 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992). In determining whether the debtor has employed reasonable business discretion with regard to the rejection of executory contracts, the court for the most part must only determine that the rejection benefit the

estate and generally will defer to the business judgment of the debtor's management. In re G. Survivor Corp., 171 B.R. 755, 758 (Bankr. S.D.N.Y. 1994) citing In re Bildisco, 682 F.2d 72, 79 (3d Cir. 1982) aff'd sub nom N.L.R.B. v. Bildisco and Bildisco, 465 U.S. 513, 104 S.Ct. 1118, 79 L.Ed.2d 482 (1984).

Courts have both approved and objected to the rejection of Franchise Agreements as part of a Section 363 Sale under the business judgment standard. See In Re G Survivor Corp., 171 B.R. at 759 (Holding that debtor's Section 363 sale which rejected a valuable trademark license was a proper exercise of the business judgment rule); In Re Petur U.S.A. Instrument Co., 35 B.R. 561, 563 (Bankr. W.D. Wash. 1983) (Refusing to authorize a rejection sale that terminated a license agreement and forced the licensee out of business).

## 2. The Objections

At its core, the objection of the Consolidated Group to debtors' Sale Motion is the possibility of a rejection sale in which the buyer will get the full IP Assets (i.e., the Dial-A-Mattress name, the "1-800-MATTRES" phone number, the "mattress.com" url and the "1-800 MATTRES® System") but terminate previously issued intercompany licenses and the rights licensed to Franchisees. The Newco Bid is a rejection sale. The Consolidated Group believes that such a sale would counteract the fundamental purpose of the Bankruptcy Code because it would not enable the debtors to preserve the business. Moreover, the Consolidated Group maintains that a rejection sale would have a devastating effect on the business of the Franchisees, causing them to shut operations and terminate employees.

The Consolidated Group further argued that the debtors' decision making authority with respect to the rejection of the Franchise Agreements is limited. Recognizing that

the standard with which to judge a debtors' decision whether to sell its assets, or to assume or reject an executory contract, is the business judgment test, the Consolidated Group argues that there is no plausible business justification for the rejection of the Franchise Agreements. The Consolidated Group maintains that Franchisee's operations have been profitable, and Dial International is a financially viable company.

### 3. Application of the Standard

The Court's independent review confirms that rejection of the Franchise Agreements benefits the estate and that the decision to conduct the auction sale is a proper exercise of business judgment. The Court rejects the argument that any Section 363 Sale that includes a rejection of the Franchise Agreements is not in the best interests of the estate and in violation of the fundamental principles of the Bankruptcy Code. Here, the Court finds that the potential rejection damages claim of the Franchisees is an important factor to be considered in the business judgment analysis. For this reason, the Court conducted a hearing on May 19, 2009 for the sole purpose of calculating estimated damages in a rejection sale scenario. The Court reviewed expert reports which the Committee and the Consolidated Group submitted, and heard the arguments and proffers of counsel. Recognizing that the rejection of the Franchise Agreements could have devastating effects of the Franchisees and involve complicated litigation, the Court estimated that the claims may be worth $11.4 million. This figure was incorporated into the determinating factors at the auction as an indication the debtors valued the potential rejection damages claim as well.

This case began as an involuntary Chapter 7 case against Dial, and the debtors do not have the resources to continue operations and reorganize, but have converted the matter to a

Chapter 11 case in order to preserve the value of the company. The Court finds that the debtors have shown that the Newco Bid presents the greatest benefits to the estate. There was a spirited auction with seven rounds of bidding that ended with the Newco Bid in the amount of $25 million. The Newco bid was $320,000 more than the second highest bidder, which was $270,000 more than the required minimum bidding increment. In addition to the estimated franchise damages claim, the debtors took into consideration various factors in determining the highest and best offer including DIP financing, assumption of leases, and employee contracts. The court-approved investment bankers found that the Newco Bid was the highest and best offer creating an 85% return to unsecured creditors. As such, the Court accepts the Newco Bid, supported by the debtors and the Committee, as the highest and best offer, and finds that the decision to sell substantially all of the debtors' assets to Newco, while rejecting the Franchise Agreements, would be an appropriate business judgment decision.

### B. This Court has the Authority to Approve a Sale

In conjunction with their objection to the rejection sale, the Consolidated Group contends that there are significant contractual, statutory and operational issues that need to be adjudicated outside of the Section 363 sale process if the Franchise Agreements are to be rejected. As shown below, these objections are without merit.

First, Consolidated Group argues that applicable non-bankruptcy law restricts the debtors from terminating the Franchise Agreements. The Consolidated Group relies principally on Section 959(b) of Title 28 of the United States Code which provides, in relevant part, as

follows:

> a trustee . . . in any case pending in any court of the United States, including a debtor in possession, shall manage and operate the property in his possession as such trustee . . . according to the requirements of the valid laws if the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof.

28 U.S.C. §959(b). The Consolidated Group argues that under applicable Connecticut State statutes Dial International cannot terminate the Franchise Agreements without good cause, operate a competing sleep products business in their exclusive market, or sell its operating assets to an entity unless the buyer commits in writing to comply with all of the company's obligations. See CONN. GEN. STAT. ANN. §42 -133f(a) (2000).

Many courts have taken the position that Section 959(b) has no application to a debtor's proposed sale of substantially all of their assets. See In re N.P. Mining Co., Inc., 963 F.2d 1449 (11th Cir. 1992); In re Globe Bldg. Materials Inc., 345 B.R. 619 (Bankr. N.D. Ind. 2006). However, even if Section 959(b) were applicable to a liquidating debtor, Section 365 of the Bankruptcy Code preempts state franchise laws. State or local laws are preempted where compliance with those laws would frustrate a liquidation. See e.g., In re Baker & Drake, 35 F.3d 1348, 1353-54 (9th Cir.); In re Ray, 355 B.R. 253, 257-58 (Bankr. D. Ore. 2006); In re Shenango Group, Inc., 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995). Pursuant to Section 365(a) of the Bankruptcy Code, a debtor can maximize the value of its estate by accepting contracts that are beneficial to it and rejecting those that are not. See In re Bethlehem Steel Corp., 291 B.R. 260, 264 (Bankr. S.D.N.Y. 2003). The state franchise laws that the Consolidated Group cite cannot impair the bankruptcy rights that the debtors possess under Section 365. See In re City of Vallejo, 403 B.R. 72, 77 (Bankr. E.D. Cal. 2009) ("Congress enacted section 365 to provide

debtors the authority to reject contracts . . . [t]his authority preempts state law by virtue of the Bankruptcy Clause [and] the Supremacy Clause."); <u>In re Tom Stimus Chrysler-Plymouth, Inc.</u>, 134 B.R. 676, 679 (Bankr. M.D. Fla. 1991) (Holding that Section 365 of the Bankruptcy Code governs the assumption or rejection of a contract, even if the agreement otherwise would have been terminated under Florida dealer laws). The Court finds that the debtors have the right to terminate the Franchise Agreements under Section 365 of the Bankruptcy Code.

Second, the Consolidated Group asserts that certain intellectual property issues should prohibit the Court's approval of the debtors' Sale Motion. The Consolidated Group maintains that the Franchise Agreements are protected under 11 U.S.C. 365(n), and as such, that the Consolidated Group has exclusive rights to use the IP Assets and to operate Dial-A-Mattress business in its assigned territories that will not be terminated with the rejection of the intercompany licenses. Under this theory, the Franchisees, as licensees of Intellectual Property, can elect to retain their rights. <u>See</u> 11 U.S.C. 365(n)(1). In addition, Consolidated Group raises issues over the ownership and use of the 1-800-Mattress jingle, alleging that Dial Operating and Dial International do not own all of the assets used to operate the Dial-A-Mattress business.

In response, the debtors maintain that Section 365(n) is not applicable to trademarks, and that trademark licensees cannot use Section 365(n) to elect to retain their rights to use a mark after rejection. <u>See</u> <u>In re Exide Technologies</u>, 340 B.R. 222, 250-251 (Bankr. D. Del. 2006).

The Court finds that the issues of copyright ownership and use of the debtors' trademark are not relevant at this time to the approval of debtors' Sale Motion. The Court accepted that there would be substantial damages arising from the rejection of the Franchise

Agreements and provided an estimate of potential damages to be used at the Auction under this reasoning. Any decision regarding these issues should be deferred to such time as there is a genuine conflict over the property.

### C. Newco is a Good Faith Purchaser under Section 363(m)

The Consolidated Group alleges that Newco is not a good faith purchaser under 11 U.S.C. § 363(m). The Consolidated Group views the proposed sale as an attempt by the owner and key management of debtors to favor a purchase by Newco. In particular, the Consolidated Group alleges that the debtor favored Newco in selecting it as the Stalking Horse Bidder, and that the estimated value of officer loans used at the Auction were undervalued in favor of Newco.

The Consolidated Group also objects to the debtors' Sale Motion on the grounds that a sale to Newco would violate Section 7 of the Clayton Act, codified at 15 U.S.C. §§ 18 and 18A, prohibiting transactions where the effect may substantially lessen competition. The Consolidated Group alleges that the sale would be anti-competitive and harmful to consumers because it would significantly increase Newco/Sleepy's market share in the New York metropolitan market.

The Court rejects these allegations. While the Bankruptcy Code does not define "good faith purchaser" under Section 363(m), courts have adopted an equitable definition: " 'one who purchases the assets for value, in good faith and without notice of adverse claims.' " Licensing by Paolo v. Sinatra (In re Gucci), 126 F.3d 380, 384 (2d Cir. N.Y. 1997) (internal citations omitted). The debtors have shown that they conducted an open and fair auction process. The debtors established a Virtual Data Room so that all potential bidders would have access to

the same information. The Trenwith Scorecard with which the investment bank evaluated the bids to create a predicted return to unsecured creditors was dispersed prior to the Auction. There were five Qualified Bidders at the time of the Auction and seven rounds of spirited bidding. After each round the Trenwith Scorecards were distributed to Qualified Bidders so that they may review the results. In addition, the debtors' assets have been purchased for considerable value. The Newco Bid of $25 million was $320,000 higher than the second highest bid, and substantially greater than the original Stalking Horse bid of $2.1 million. The Court finds that Newco is a good faith purchaser under Section 363(m).

The Court also declines to entertain the Consolidated Group's Clayton Act allegations. Both parties acknowledge that a sale of the debtors' assets to Newco does not require approval of the Federal Trade Commission pursuant to 15 U.S.C. §18A. Consolidated Group has not submitted any substantial evidence to the Court that a sale to Newco would create an anti-competitive marketplace.

### D. The 10 Day Stay required by Bankruptcy Rules 6004 and 6006 Applies

Bankruptcy Rule 6004(h) provides "An order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." Similarly, Bankruptcy Rule 6006(d) states that "[a]n order authorizing the trustee to assign an executory contract or unexpired lease under §365(f) is stayed until the expiration of 10 days after the entry of the order, unless the court orders otherwise." Debtors maintain that a quick consummation of the sale directly benefits substantially all of the debtors' creditors as the costs of continuing operations will no longer be bourne by the estate. Therefore, the debtors' request a waiver of the 10 day stay required by Bankruptcy Rules 6004 and 6006. The Consolidated Group asserts that there is no basis for a waiver of the 10 day stay

under Rules 6004 and 6006, and requests that the Court deny debtors' request for a waive of the 10 day stay.

The debtors have failed to establish any exigent circumstances which would support a waiver of the 10 day stay. The Court denies that portion of the Motion which seeks waiver of the 10 day stay required by Bankruptcy Rule 6004 and 6006.

**E.  The Post Hearing Submission - Denial of the Motion to Correct the Record**

On June 2, 2009, counsel for the Consolidated Group filed a motion to correct the evidentiary record on the debtors' motion to sell substantially all of their assets. In this motion, the Consolidated Group sought to correct the amount of the so-called officer loans, and in so doing claimed that the value of the officer loans bore on the issue of which was the highest and best bid. The Consolidated Group claimed that the increased value of the loans enhanced the value of its bid.

Counsel for the debtors argued that the officer loans, to which this Motion refers, were not valued for purposes of the Auction. In addition, counsel for the debtor noted that due to the elasticity in the claims estimates, the final allowance of any single line item would affect the bids depending upon the facts involved. An ultimate change in valuation of any line item was factored into the ultimate analysis of the highest and best offer before Trenwith made a recommendation.

The Consolidated Group's motion to correct the evidentiary record was neither solicited nor authorized under this Court's Local Rules or the Federal Rules of Bankruptcy Procedure. Other factors strongly suggested that the Court disregard this untimely submission. Each party had a full and fair opportunity to submit or make such a statement at the Sale

Hearing. No party made a request to file a post hearing submission. Under those circumstances, the Court considered the hearing closed. Nonetheless, the Court has considered the Consolidated Group's Motion. The Court finds that all the parties have had a full and fair opportunity to present their positions and evidence on the Debtors' Motion to Approve the Sale and at the May 28, 2009 hearing. As stated above, the Court accepts the Newco Bid as the highest and best offer. The Post-Hearing Motion of the Consolidated Group to correct the evidentiary record at this stage is denied.

## V. CONCLUSION

The Court accepts the Newco Bid, supported by the debtors and the Committee, as the highest and best offer, and finds that the decision to sell substantially all of the debtors' assets to Newco, while rejecting the Franchise Agreements, would be an appropriate business judgment decision. As such, the Court grants debtors' Motion (i) approving the sale of substantially all of the debtors' assets free and clear of liens, claims, encumbrances and other interests; and (ii) authorizing the assumption and assignment and/or rejection of certain executory contracts and unexpired leases. The Court denies that portion of the Motion which seeks waiver of the 10 day stay under Bankruptcy Rules 6004 and 6006. The Post-Hearing Motion of the Consolidated Group to correct the evidentiary record at this stage is denied. All Objections, if any, to the Sale Motion or the relief requested therein that have not been withdrawn, waived or settled as announced to the Court at the Sale Hearing or by stipulation filed with the Court are hereby overruled, except as expressly provided herein and in the final order.

Counsel for the debtors is directed to submit an Order consistent with this

Decision.

Dated: Brooklyn, New York
      June 24, 2009

                                                              <u>S/ Dennis E. Milton</u>
                                                              DENNIS E. MILTON
                                                             United States Bankruptcy Judge