# EXHIBIT A

## AMENDED AND RESTATED ASSET PURCHASE AGREEMENT

AMENDED AND RESTATED ASSET PURCHASE AGREEMENT

by and among

NewCo Trading LLC (the "Purchaser")

and

DIAL-A-MATTRESS OPERATING CORP.,

1-800-MATTRESS CORPORATION, and

DIAL-A-MATTRESS INTERNATIONAL LTD.

(collectively, the "Seller")

Dated as of July 21, 2009

# TABLE OF CONTENTS

                                                                                    **Page**

ASSET PURCHASE AGREEMENT ...................................................................................1

1.    Definitions; Interpretation .........................................................................................2

        Definitions ..........................................................................................................2

        Headings; Interpretation ....................................................................................8

2.    Purchase and Sale. ....................................................................................................8

        Purchase and Sale ..............................................................................................8

        Excluded Assets .................................................................................................9

        Assumed Obligations .......................................................................................10

        Excluded Liabilities .........................................................................................10

        Assignment of Assigned Contracts and Assigned Leases and Rights .......10

2.6    Purchase Price. ................................................................................................11

2.7    Deposit. ............................................................................................................11

        Closing .............................................................................................................12

        Deliveries by the Seller ...................................................................................12

        Deliveries by the Purchaser ............................................................................12

2.11   Post-Closing Delivery by the Seller ..............................................................13

2.12   Litigation Reserve. ..........................................................................................13

        Representations and Warranties of the Seller .................................................13

        Organization.....................................................................................................13

        Corporate Authorization ..................................................................................13

        Governmental Authorization ...........................................................................13

        Litigation ..........................................................................................................14

3.5    Sufficiency of and Title to the Acquired Assets. ..........................................14

Intellectual Property.........................................................................14

3.7 Assigned Contracts and Assigned Leases...............................15

Benefit Plans...................................................................................15

Representations and Warranties of the Purchaser..............................15

Organization...................................................................................15

Authorization..................................................................................15

Noncontravention...........................................................................16

Financing/Adequate Assurance.....................................................16

Litigation........................................................................................16

5. Covenants of the Seller.............................................................16

5.1 Conduct of the Business..........................................................16

Access to Information.....................................................................17

Notices of Certain Events..............................................................17

Intellectual Property.......................................................................17

6. Covenants of the Purchaser......................................................18

Adequate Assurance.......................................................................18

Assumed Obligations.....................................................................18

6.3 Returned Goods.......................................................................18

6.4 Notices of Certain Events.......................................................18

DIP Loan........................................................................................19

Payment of Cure Costs..................................................................19

6.7 Employee Obligations.............................................................19

7. Covenants of the Purchaser and the Seller..............................21

Efforts; Further Assurances............................................................22

Public Announcements...................................................................22

| | 7.3 | Bankruptcy Issues. | 22 |
|---|---|---|---|
| 8. | | Tax Matters. | 23 |
| | | Tax Cooperation | 23 |
| | | Transfer Taxes | 23 |
| | | Allocation | 23 |
| 9. | | Closing Conditions | 23 |
| | | Conditions to Obligations of the Purchaser and the Seller | 23 |
| | | Conditions to Obligations of the Purchaser | 24 |
| | | Conditions to Obligations of the Seller | 25 |
| 10. | | Survival. | 25 |
| 11. | | Termination. | 25 |
| | | Grounds for Termination | 25 |
| | | Effect of Termination | 26 |
| | | Expenses | 26 |
| 12. | | Miscellaneous. | 26 |
| | | Notices | 26 |
| | | Waivers | 27 |
| | | Successors and Assigns | 27 |
| | | Governing Law | 27 |
| | | Jurisdiction | 27 |
| | | Entire Agreement; Amendments; Counterparts | 28 |
| | | Deposits | 28 |
| | | Effectiveness | 28 |

## AMENDED AND RESTATED ASSET PURCHASE AGREEMENT

THIS AMENDED AND RESTATED ASSET PURCHASE AGREEMENT, dated as of July 21, 2009 (this "Agreement"), is entered into by and among NewCo Trading LLC (the "Purchaser") and Dial-A-Mattress Operating Corp., 1-800-Mattress Corporation, and Dial-A-Mattress International Ltd. (collectively, the "Seller"). The Purchaser and the Seller are sometimes individually referred to in this Agreement as a "Party" and collectively as the "Parties."

## RECITALS:

WHEREAS, the Seller is engaged in the business of selling mattresses and related items at its retail store locations, by phone, on the internet and through other distribution channels using the brand names "1-800-Mattress" and "Dial-A-Mattress" and other names, marks and logos (the "Business");

WHEREAS, the Seller desires to sell, transfer, convey, assign and deliver the Acquired Assets (as defined below) and to assign the Assumed Obligations (as defined below), and the Purchaser desires to purchase and assume such Acquired Assets and Assumed Obligations, upon the terms and subject to the conditions set forth herein;

WHEREAS, on March 17, 2009 an involuntary Chapter 7 bankruptcy case in the United States Bankruptcy Court for the Eastern District of New York (Brooklyn Division) (the "Bankruptcy Court") was commenced against Dial-A-Mattress Operating Corp. ("Dial");

WHEREAS, on March 23, 2009 (the "Voluntary Petition Date"), Dial consented to the entry of an Order for Relief and by order of the Bankruptcy Court entered on March 26, 2009, Dial's Chapter 7 case was converted to one under Chapter 11 of the Bankruptcy Code;

WHEREAS, on the Voluntary Petition Date, each of 1-800 Mattress Corporation ("1-800") and Dial-A-Mattress International ("Int'l") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code;

WHEREAS, the Chapter 11 cases of each of Dial, 1-800 and Int'l are being jointly administered (collectively, the "Bankruptcy Case") under Case No. 09-41966 in the Bankruptcy Court;

WHEREAS, the transactions contemplated by this Agreement (the "Transactions") will be consummated pursuant to a Sale Order (as defined below) to be entered in the Bankruptcy Case under Sections 105, 363, 365 and other applicable provisions of the Bankruptcy Code (as defined below), and the Transactions and this Agreement are subject to the approval of the Bankruptcy Court;

WHEREAS, the Purchaser and the Seller entered into an Asset Purchase Agreement dated as of March 20, 2009 (the "Stalking Horse Agreement"), pursuant to which the Purchaser Agreed to purchase certain of the Seller's assets as more fully set forth therein, which agreement was subject to higher and better offers from third parties pursuant to a auction contemplated by a

sale procedures order of the Bankruptcy Court dated March 31, 2009, as amended by an order dated April 28, 2009 (the "Procedures Order"); and

WHEREAS, the Parties desire to amend and restate the Stalking Horse Agreement to reflect, among other things, the result of the auction conducted on May 26, 2009;

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements, covenants, representations, warranties and promises set forth herein, and in order to prescribe the terms and conditions of such purchase and sale, intending to be legally bound, the Parties agree as follows:

1.     **Definitions; Interpretation.**

1.1     Definitions.  The following terms, as used herein, have the following meanings:

"Acquired Assets" shall have the meaning ascribed to such term in Section 2.1 of this Agreement.

"Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such other Person.

"Agreement" shall have the meaning ascribed to such term in the first paragraph of this Agreement.

"Allowed" when used as an adjective preceding the words "Employee Claim" means any Employee Claim against the Seller proof of which was filed on or before the date designated by the Bankruptcy Court as the last date for filing proofs of Claim against such Seller, or if no proof of Claim is filed, which (a) has been or hereafter is listed by the Seller on its respective Schedules as liquidated in amount and not disputed or contingent, and which in either case, is a Claim as to which no objection to the allowance thereof has been interposed within the applicable period of limitations fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, or as to which any objection has been interposed and such Claim has been allowed in whole or in part by an Order of the Bankruptcy Court.  The Seller (or its successor) shall confer with the Purchaser and the Committee with regard to all Employee Claims and any objections related thereto.

"Assigned Contracts" shall mean those Contracts identified by the Purchaser as being assumed on Schedule 3.7(a) hereto.

"Assigned Leases" shall mean those Real Property Leases identified by the Purchaser as being assumed by Purchaser and set forth on Schedule 3.7(a).

"Assumed Obligations" shall have the meaning ascribed to such term in Section 2.3 of this Agreement.

"Auction" shall mean the auction conducted by the Seller on May 26, 2009 with respect to the sale of the Acquired Assets.

"Avoidance Actions" means all avoidance claims or other causes of action, whether arising under the Bankruptcy Code or otherwise, and the proceeds thereof, which are available to the Seller under Section 510 or under any of Sections 542 through 553 of the Bankruptcy Code, of whatever kind or nature, and whether asserted or unasserted.

"Bankruptcy Case" shall have the meaning ascribed to such term in the sixth WHEREAS clause of this Agreement.

"Bankruptcy Code" means Title 11 of the United States Code (11 U.S.C. § 101 et seq.), as amended.

"Bankruptcy Court" shall have the meaning ascribed to such term in the third WHEREAS clause of this Agreement.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure.

"Books and Records" shall have the meaning ascribed to such term in Section 2.1(e) of this Agreement.

"Break Up Fee" shall have the meaning ascribed to such term in Section 7.3(c) of this Agreement.

"Bridge Loan" shall mean that certain loan made by the Purchaser to the Seller in the principal amount of One Hundred Fifty Thousand and 00/100 Dollars made pursuant to a Bridge Loan and Security Agreement, by and between the Seller and the Purchaser, dated as of March 20, 2009.

"Business" shall have the meaning ascribed to such term in the first WHEREAS clause of this Agreement.

"Business Day" means a day other than Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by law to close.

"Cash Payment" shall have the meaning ascribed to such term in Section 2.6(a) of this Agreement.

"Claim" means a "claim" as defined in Section 101 of the Bankruptcy Code.

"Closing" shall have the meaning ascribed to such term in Section 2.8 of this Agreement.

"Closing Date" means the date of the Closing.

"COBRA" means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended.

"Code" means the Internal Revenue Code of 1986, as amended.

"Committee" means the Official Committee of Unsecured Creditors in the Bankruptcy Case

"Contracts" means all of the Seller's franchise agreements, distribution agreements, partnership agreements and similar agreements described on Schedule 1 hereto.

"Cure Costs" means all amounts that must be paid and all obligations that otherwise must be satisfied, including pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with the assumption and/or assignment of the Assigned Contracts and the Assigned Leases to the Purchaser as provided herein, in an aggregate amount not to exceed $380,646.00.

"Cure Cost Escrow Account" means the non-interest bearing escrow account containing the Cure Cost Escrow Amount to be established by the Purchaser with counsel for the Seller on the Closing Date in accordance with the provisions of Section 2.6(a) of this Agreement and to be disbursed in accordance with the provisions of Section 2.6(a) of this Agreement and an escrow agreement with respect to the Cure Cost Escrow Account to be entered into on the Closing Date among the Seller, the Purchaser and counsel for the Seller, as escrow agent.

"Cure Cost Escrow Amount" means the amounts to be deposited by the Purchaser on the Closing Date in the Cure Cost Escrow Account. The Cure Cost Escrow Amount shall be determined by adding the numbers in the final columns of Schedule 3.7(a).

"Customer Ordered Merchandise" means those items of finished goods inventory located in the Stores and Warehouse that have previously been earmarked and/or reserved from available merchandise and designated by the Seller for satisfaction of customer orders (whether in respect of a fully sold order or a partially reserved order) that were received prior to the Closing Date.

"Defective Merchandise" means such items of inventory that are non-first quality inventory, such as parts, incomplete sets of inventory intended to be sold as a set, mismatched sets, and used or previously owned, damaged, shopworn, soiled inventory and supplies; and such items of inventory that cannot be used for their intended purpose.

"Deposit" shall have the meaning ascribed to such term in Section 2.7(a) of this Agreement.

"DIP Loan" means that certain loan made by Purchaser to Seller in the principal amount of $1,250,000, and all interest, fees, expenses and other obligations thereunder, as evidenced by that certain DIP Loan and Security Agreement dated March 27, 2009 between Seller and Purchaser, as amended by an agreement dated May 22, 2009, as amended further by an agreement dated June 10, 2009, as amended further by an agreement dated June 30, 2009, as the same may be further amended (and any documents ancillary thereto).

"Display Merchandise" means bedding and mattresses that are on display at the Stores and Warehouse, manufacturers samples and flyer samples.

"Employee Claims" means all Allowed Claims by Employees of the Seller on account of accrued vacation, sick days, personal days, and severance.

"Employee Claims Limit" means $2,225,000.00, less a credit for the Employee Claims Threshold.

"Employee Obligations" shall have the meaning described to such term in Section 6.7 of this Agreement.

"Employee Claims Threshold" means $1,275,000.00, plus Employee Claims asserted by members of the Windown Staff (as hereinafter defined).

"Employment Agreement" shall mean those certain Employment Agreements, as amended, substantially in the form of Exhibit B hereto between Napoleon Barragan and the Purchaser.

"End Date" shall have the meaning ascribed to such term in Section 9.2 (d) of this Agreement.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Excluded Assets" shall have the meaning ascribed to such term in Section 2.2 of this Agreement.

"Excluded Liabilities" shall have the meaning ascribed to such term in Section 2.4 of this Agreement.

"Expense Reimbursement" shall have the meaning ascribed to such term in Section 7.3(c) of this Agreement.

"FF&E" means fixtures, furnishings and equipment owned by the Seller.

"Final Release Date" means the earlier of (a) the date on which all Cure Costs claimed by third parties under the Assigned Contracts and lessors of the Assigned Leases have been paid or released and (b) the six-month anniversary of the Closing other than with respect to Cure Costs which are subject to bona fide dispute .

"HSR Act" shall have the meaning ascribed to such term in Section 3.3(b) of this Agreement.

"Intellectual Property" means all of Seller's United States and foreign:

(a)     trademarks and service marks (whether registered or unregistered), trade names, business names, brand names, trade dress, slogans, logos and designs, including all goodwill associated with the foregoing and all registrations and applications for any and all of the foregoing;

(b)     copyright works (whether registered or unregistered) and applications and registrations therefore and any renewals and extensions thereof;

(c)     patents, utility models, and registrations and patent applications relating to the foregoing (including any and all provisionals, continuations, continuations-in-part, divisionals, counterparts, reissues, reexaminations, extensions, renewals and applications and invention disclosures;

(d)     internet domain names, and all registrations and applications with respect to the foregoing;

(e)     websites;

(f)     telephone numbers including, but not limited to, "1-800-Mattres";

(g)     licenses to use or practice a third party's intellectual property falling within the preceding subsections (a) through (f);

(h)     [intentionally omitted];

(i)     any of the foregoing owned jointly with one or more third parties; and

(j)     any other proprietary intellectual property right which is related to the Business or used in the conduct of the Business.

"Knowledge of the Seller" or any other similar knowledge qualification in this Agreement means all facts actually known by the President of the Seller.

"Lien" means, with respect to any property or asset, any mortgage, lien, pledge, charge, security interest or other encumbrance in respect of such property or asset.

"Merchandise" means (a) all finished goods inventory that is owned by the Seller located at the Stores, the Warehouse or any other location on the Closing Date; (b) Customer Ordered Merchandise at any location on the Closing Date, and (c) Display Merchandise at any location on the Closing Date; provided, however, that, notwithstanding the foregoing, "Merchandise" shall not include (i) goods which belong to sublessees, licensees or concessionaires of the Seller, and (ii) goods held by the Seller on consignment, or as bailee.

"Other Proprietary Information" means:

(a) confidential information and proprietary information including, without limitation, any idea, formula, algorithm, design pattern, invention, unpublished patent application, compilation, program, specification, data, device, methods, technique, process, customer lists, databases or other know-how that derives independent economic value from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and

(b) all custom computer software including all source code, object code, firmware, development tools, files, records and data, all media on which any of the foregoing is recorded, and all documentation related to any of the foregoing;

In each case which is related to the Business or used in the conduct of the Business.

"Party" and "Parties" shall have the meaning ascribed to such term in the first paragraph of this Agreement.

"Person" means an individual, corporation, partnership, limited liability company, association, trust or other entity or organization, including a governmental unit or political subdivision thereof.

"Plan" means a plan of liquidation filed in the Bankruptcy Case and confirmed by the Bankruptcy Court.

"Procedures Order" shall have the meaning ascribed to such term in the eighth "Whereas" clause of this Agreement.

"Purchase Price" shall have the meaning ascribed to such term in Section 2.6(a) of this Agreement.

"Purchaser" shall have the meaning ascribed to such term in the first paragraph of this Agreement.

"Real Property Leases" means the real property leases of the Seller of the Stores and Warehouse set forth on Exhibit A attached hereto.

"Sale Order" shall have the meaning ascribed to such term in Section 7.3(b) of this Agreement.

"Seller" shall have the meaning ascribed to such term in the first paragraph of this Agreement.

"Seller Shareholder Loans Receivable" shall have the meaning ascribed to such term in Section 2.1(g).

"Stores" means those retail store locations in respect of the Assigned Leases.

"Tax" means (a) any tax, governmental fee or other like assessment or charge of any kind whatsoever (including withholding on amounts paid to or by any Person), together with any interest, penalty, addition to tax or additional amount imposed by any governmental authority (a "Taxing Authority") responsible for the imposition of any such tax (domestic or foreign), or (b) liability for the payment of any amounts of the type described in clause (a) as a result of being party to any agreement or any express or implied obligation to indemnify any other Person.

"Taxing Authority" has the meaning ascribed to such term in the definition of "Tax" in Section 1.1 of this Agreement.

"Transactions" shall have the meaning ascribed to such term in the seventh WHEREAS clause of this Agreement.

"Transfer Taxes" shall have the meaning ascribed to such term in Section 8.2 of this Agreement.

"Warehouse" means that certain warehouse operated by the Seller, described on Exhibit A attached hereto, and located at or near 31-10 48th Avenue, Long Island City, NY.

"WARN Act" means the Workers Adjustment and Retraining Notification Act and/or any corresponding or similar applicable State Law (including the New York Workers Adjustment and Retraining Notification Act).

"Windown Staff" means those former employees and/or officers of the Seller retained by or who are hired to consult with the Seller or its successors (with the consent of the Committee) for the purposes of providing services in connection with the orderly windown and/or liquidation of the Seller following the Closing.

1.2     Headings; Interpretation.  The headings contained in this Agreement are for convenience of reference only and shall not affect the meaning or interpretation of this Agreement.  Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of authorship of any provisions of this Agreement.

**2.      Purchase and Sale.**

2.1     Purchase and Sale.  Subject to the terms and conditions set forth in this Agreement together with any Bankruptcy Court approval that may be required, at the Closing or at the times thereafter agreed to by the Parties hereto, the Seller agrees to sell, transfer and deliver to the Purchaser, and the Purchaser agrees to purchase, acquire and accept from the Seller, on an "as is, where is" basis, all right, title and interest of the Seller as of the Closing Date in and to all of the assets, properties and rights used or usable in the conduct of the Business, including but not limited to the following assets, free and clear of all Liens and Claims whatsoever to the maximum extent permitted by Section 363 of the Bankruptcy Code (the "Acquired Assets"):

(a)     all of the Seller's rights in and to the Assigned Leases together with all permanent fixtures, improvements, appurtenances thereto and FF&E associated therewith;

(b)     all of the Seller's rights in and to all Assigned Contracts;

(c)     all Intellectual Property and related rights and any causes of action relating to past or current infringement of the Intellectual Property and related rights;

(d)     all owned FF&E, machinery, equipment, personal property, office equipment, furnishings, computer hardware and spare parts relating thereto (including calculators, paper, office forms, file cabinets, chairs, desks, warehouse order pickers, tuggers, storage containers, floor cleaners, scanners, security equipment, warehouse racking, store

equipment, registers, phones, safes, communication lines, delivery trucks, tractor trailers, tractors, forklifts, material handling equipment and yard dogs) located in the Warehouse;

(e)     access to and copies (at the Purchaser's expense) of all books, records and other documents (whether on paper, computer diskette, tape or other storage media) of the Seller, relating to the Acquired Assets and Merchandise, including property records, purchase and sale records, credit data, marketing, advertising and promotional materials, accounting and financial records, fixed asset lists, customer lists, customer records and information (including internet mailing addresses), Merchandise history, historical financing information (including reserve calculations), fixed asset information, mailing and supplier lists, parts lists, correspondence, studies, sales history, files and similar items (collectively, the "Books and Records"); provided, however, that "Books and Records" shall not include incorporation documents and corporate minute books and Tax returns;

(f)     all advertising commercials, videos, photography and advertising equipment used internally, together with all internal and external signage located in or used in connection with the Acquired Assets;

(g)     the Seller shareholder and officer loans receivable from each of Napoleon Barragan and Joseph Vicens, in the principal amounts of approximately $1,850,000 and $250,000, respectively, as may be evidenced by promissory notes and/or other documents (collectively, the "Seller Shareholder Loans Receivable");

(h)     any and all of Seller's interest in and right to payment from and in connection with the split dollar life insurance policy on the life of Napoleon Barragan (John Hancock Life Insurance Policy number: UL 1408323); and

(i)     all Other Proprietary Information.

2.2     Excluded Assets.  Notwithstanding any other provision of this Agreement to the contrary, the Acquired Assets shall not include the following (the "Excluded Assets"):

(a)     all (i) Avoidance Actions and (ii) claims and causes of action arising from the Excluded Assets (all causes of action relating to past or current infringement of the Intellectual Property, other Proprietary Information  and related rights are reserved to the Purchaser and included in the Acquired Assets);

(b)     the minute books and organizational documents of the Seller;

(c)     except as set forth in Section 2.1(h), all insurance policies relating to the Business, all claims arising under such policies (whether such claims arise prior to or after the Closing) relating to the Business and all credits, premium refunds, proceeds, causes of action or rights thereunder;

(d)     all rights of the Seller arising under this Agreement;

(e)     any Tax refund, Tax rebate or Tax reimbursement due to the Seller or its Affiliates and relating to the Business or any U.S. net operating loss of the Seller;

(f)     all accounts, accounts receivable, contract rights to payment, payment intangible notes and other receivables and amounts owed to the Seller, other than the Seller Shareholder Loans Receivable;

(g)     any supplier rebates or credits owed to the Seller;

(h)     all books and records related to Excluded Assets and any Books and Records which are included in the proviso of Section 2.1(e) of this Agreement;

(i)     any unexpired lease or executory contract to which the Seller is a party other than the Assigned Contracts and the Assigned Leases;

(j)     any other asset (tangible or intangible) or rights not included within the definition of Acquired Assets;

(k)     cash of the Seller;

(l)     deposits of the Seller with third parties; and

(o)     Merchandise.

2.3     Assumed Obligations. Upon the terms and subject to the conditions of this Agreement, the Purchaser agrees, effective at the time of the Closing, to assume, pay, perform and discharge, promptly when payment or performance is due or required, the following liabilities and obligations of the Seller or the Business (the "Assumed Obligations"):

(a)     all obligations and liabilities arising under the Assigned Contracts and the Assigned Leases from and after the Closing Date (and relating solely to such period), including the cost and expense of removing the Seller's signage at the Stores; and

(b)     all Cure Costs.

2.4     Excluded Liabilities. Notwithstanding any other provision of this Agreement to the contrary, the Purchaser is assuming only the Assumed Obligations and is not assuming any other liability or obligation of the Seller of whatever nature, whether presently in existence or arising hereafter, known or unknown, disputed or undisputed, contingent or non-contingent, liquidated or unliquidated or otherwise, including (other than Employee Obligations) severance, termination pay, accrued vacation, pension, profit sharing or any other employee benefit plans, compensation or retiree medical or other benefits and obligations, or any obligation, claim or amount for employees, or any obligation, claim or amount under WARN Act or COBRA. All such liabilities and obligations shall be retained by and remain obligations and liabilities of the Seller (all such liabilities and Obligations not being assumed being herein referred to as the "Excluded Liabilities").

2.5     Assignment of Assigned Contracts and Assigned Leases and Rights. To the maximum extent permitted by the Bankruptcy Code, the Assigned Contracts and the Assigned

Leases and Intellectual Property shall be assumed by the Seller and assigned to the Purchaser or one or more of its designees pursuant to Section 365 of the Bankruptcy Code.

2.6    Purchase Price.

(a)    In consideration for the sale, transfer, assignment and delivery of the Acquired Assets, and in addition to assuming the Assumed Obligations, the Purchaser shall pay to the Seller cash in the amount of $25,000,000.00 as follows:

(i)    on the Closing Date, the Purchaser shall deliver to the Seller, by wire transfer of immediately available federal funds to a bank account (or accounts) designated in writing by the Seller to the Purchaser, an amount (the "Cash Payment") equal to (x) the difference between (A) $25,000,000.00 and (B) the sum of (1) the Deposit, (2) all amounts outstanding or otherwise due and owing as of the Closing Date in respect of obligations under or on account of the Bridge Loan, and (3) all amounts outstanding or otherwise due and owing as of the Closing Date in respect of obligations under or on account of the DIP Loan (other than the principal amount of $900,000 which is included in the Deposit as set forth in Section 2.7(a));

(ii)    on the Closing Date, the Purchaser shall provide written instructions to the Seller and the Seller's counsel:

(A)    to release the Deposit to the Seller, which Deposit shall be applied as a credit against the Purchase Price; and

(B)    to apply all amounts due and owing under the Bridge Loan and the Dip Loan as a credit against the Purchase Price whereupon all such obligations shall be deemed paid in full.

(b)    On the Closing Date, in addition to the Cash Payment, Purchaser shall deposit into an escrow account (the "Cure Cost Escrow Account") with the Seller's counsel the sum of $380,646.00 to pay the Cure Costs. The Seller may withdraw amounts from the Cure Cost Escrow Account in accordance with Section 6.6 of this Agreement for the purposes of paying the Cure Costs.

(c)    In addition to the payments under 2,6 (a) and (b) above, Purchaser shall pay, as and when due under Section 6.7, to the Seller (or its successor) such amounts as it is required to pay in connection with the Employee Obligations.

(d)    The aggregate of the amounts to be paid to the Seller pursuant to Section 2.6 are referred to as the "Purchase Price."

2.7    Deposit.

(a)    Purchaser has previously deposited into escrow with the Seller's counsel an amount equal to $210,000.00 (the "Initial Deposit"). By no later than 12:00 pm on May 27, 2009, the Purchaser shall make an additional deposit into escrow with the Seller's counsel sufficient to increase the Deposit to $2,500,000.00, including by crediting against the same the

portion of the DIP Loan which has already been advanced to the Sellers pursuant to the DIP Loan (the "Additional Deposit" and together with the Initial Deposit, the "Deposit"). The cash portion of the Deposit shall be held by the Seller's counsel in a non-interest bearing escrow account pursuant to an escrow agreement in the form attached as Exhibit 2.7 hereto. For the avoidance of doubt, the entire DIP Loan shall be deemed a portion of the Deposit for the purposes of Section 2.7(b) and 2.6(a)(i)hereof. Notwithstanding the previous sentence, the Seller and the Purchaser agree that in no event shall the Deposit, subject to retention by the Seller under Section 2.7(b), exceed $2,500,000.

(b)     The Deposit may be retained by the Seller (i) at the Closing as a credit against the Purchase Price, as contemplated by Section 2.6(a) of this Agreement, or (ii) if this Agreement is terminated pursuant to Section 11.1(c) hereof and all of the conditions of each of Section 9.1 and Section 9.2 (a), (b), (c), (d) (except for the requirement of a Closing having occurred), (e) and (i) of this Agreement have been satisfied. The Deposit shall be returned to the Purchaser within two (2) Business Days after any termination of this Agreement pursuant to Section 11.1(a) or Section 11.1(b) hereof or if the Acquired Assets are sold to any person other than the Purchaser.

2.8     Closing. The closing (the "Closing") of the purchase and sale of the Acquired Assets and the assumption of the Assumed Obligations shall take place at the offices of Moritt Hock Hamroff & Horowitz LLP on August 17, 2009, or at such other time or place as the Purchaser and the Seller may agree.

2.9     Deliveries by the Seller. At the Closing, the Seller will deliver or cause to be delivered to the Purchaser (unless delivered previously) the following:

(a)     a Bill of Sale substantially in the form attached hereto, duly executed by the Seller pursuant to which the Seller shall transfer and convey the Acquired Assets to the Purchaser;

(b)     the original notes, if any, documenting the Seller Shareholder Loans Receivable;

(c)     all other documents, instruments and writings reasonably requested by the Purchaser to be delivered by the Seller at or prior to the Closing in connection with the conveyance of the Acquired Assets to the Purchaser pursuant to this Agreement;

(d)     a copy of the executed Sale Order; and

(e)     documents in form and substance reasonably satisfactory to Purchaser and Seller, in recordable form as is necessary to convey, vest and secure the full right, title and interest in and to the Intellectual Property to the Purchaser, including but not limited to an Assignment relating to the transfer of Intellectual Property substantially in the form of Exhibit C.

2.10     Deliveries by the Purchaser. At the Closing, the Purchaser will deliver or cause to be delivered to the Seller or its counsel, as applicable (unless previously delivered) the following:

(a)    the Cash Payment and the Cure Cost Escrow Amount;

(b)    written instructions signed by the Purchaser as contemplated by Section 2.6(a)(ii) directing the release of the Deposit to the Seller and confirming the application of the Bridge Loan and Dip Loan obligation to the Purchase Price in lieu of payment by the Seller thereon;

(c)    documents in form and substance reasonably satisfactory to Purchaser and Seller, as may be necessary to effect the assignment by the Seller and the assumption by the Purchaser of the Assigned Contracts and Assigned Leases; and

(d)    all other documents, instruments and writings reasonably requested by the Seller to be delivered by the Purchaser at or prior to the Closing in connection with the consummation of the Transactions pursuant to this Agreement.

2.11    Post-Closing Delivery by the Seller. Subsequent to the Closing, the Seller will deliver or cause to be delivered to the Purchaser such agreements, documents and instruments, and Seller shall take such actions, as are reasonably requested by the Purchaser from time to time in order to effectuate the transactions contemplated hereby in accordance with the provisions hereof.

**3.    Representations and Warranties of the Seller**. The Seller hereby represents and warrants to the Purchaser as of the date hereof (or as otherwise expressly set forth in any provision of this Section 3):

3.1    Organization. Dial is a corporation duly organized, validly existing and in good standing under the laws of the State of New York, and has the corporate power and authority to own, lease and operate the Acquired Assets which it owns, and to carry on in all material respects the Business as now being conducted. 1-800 is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, and has the corporate power and authority to own, lease and operate the Acquired Assets which it owns, and to carry on in all material respects the Business as now being conducted. Int'l is a company, organized, under the laws of Delaware, and except as may be limited by its failure to remain in good standing under Delaware law, has the company power and authority to own, lease and operate the Acquired Assets which it owns, and to carry on in all material respects the Business as now being conducted.

3.2    Corporate Authorization. The execution, delivery and performance by the Seller of this Agreement and the consummation of the Transactions are within the Seller's corporate powers and have been duly authorized by all necessary action on the part of the Seller. Subject to entry by the Bankruptcy Court of the Sale Order in the Bankruptcy Case, this Agreement constitutes a valid and binding agreement of the Seller that is enforceable in accordance with its terms.

3.3    Governmental Authorization. The execution, delivery and performance by the Seller of this Agreement and the consummation of the transactions contemplated hereby by the Seller require no action by or in respect of, or filing with, any governmental body, agency or official other than:

(a)     consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court; and

(b)     if applicable, compliance with the Hart-Scott-Rodino Antitrust Improvements Act of 1975, as amended (the "HSR Act").

3.4     Litigation.  Except as disclosed in Schedule 3.4, as of the date hereof, there is no action, suit, investigation or proceeding pending against, or to the Knowledge of the Seller, threatened against or affecting, the Acquired Assets before any court or arbitrator or any governmental body, agency or official that in any manner challenges or seeks to prevent, enjoin, alter or materially delay the Transactions.

3.5     Sufficiency of and Title to the Acquired Assets.

(a)     Upon consummation of the Transactions, the Purchaser will have acquired good title in and to, or a valid leasehold interest in, each of the Acquired Assets, free and clear of all Liens and Claims pursuant to Sections 105, 363 and 365 of the Bankruptcy Code.

(b)     On the Closing Date, the Acquired Assets shall be free and clear of all Liens and Claims to pursuant to Sections 105, 363 and 365 of the Bankruptcy Code.

3.6     Intellectual Property.

(a)     The material items comprising the Intellectual Property are disclosed on Schedule 3.6(a).

(b)     All Intellectual Property disclosed on Schedule 3.6(a) is valid, in proper form, enforceable and subsisting, except as otherwise set forth on Schedule 3.6(b).

(c)     Except as set forth on Schedule 3.6(b), the Seller owns the exclusive right, title and interest in, or has the right to use pursuant to valid license agreement all Intellectual Property in the manner in which such Intellectual Property is used in the Business before the Closing.

(d)     Except as set forth on Schedule 3.6(b), to the Knowledge of Seller, the Business does not cause the Seller to infringe or violate any of the patents, trademarks, service marks, trade names, mask works, copyrights, domain names, trade secrets, proprietary rights or other intellectual property of any other person, and the Seller has not received any written or oral claim or notice of infringement or potential infringement of the intellectual property of any other person.

(e)     To the Knowledge of the Seller: (i) there is no infringement of the Intellectual Property by any third party; (ii) other than Seller, no third person or entity has any rights to use any Intellectual Property and Seller has not entered into, or is otherwise bound by, any consent, forbearance or any settlement agreement which limits the Seller's rights to use the Intellectual Property; and (iii) the Seller is not in default (or with the giving of notice of lapse of time or both, would be in default) under any contract to use the Intellectual Property.

(f)     Except as set forth on Schedule 3.6(b), all right, title and interest of the Seller in the Intellectual Property is transferable to Purchaser as contemplated in this Agreement and the consummation of the transactions contemplated hereby relating to the Intellectual Property will not require the consent of any third party.

(g)     All persons who have contributed to the creation or development of the Intellectual Property have assigned ownership to the Seller of any rights therein that do not vest in the Seller by operation of law to the extent allowed by applicable law, and such assignments are legally binding and enforceable against such persons.

3.7     Assigned Contracts and Assigned Leases.

(a)     Each of the material Assigned Contracts and the Assigned Leases is legal, valid, binding, enforceable and in full force and effect.  Schedule 3.7(a) sets forth all amounts necessary to cure the Sellers defaults under the Assigned Contracts and Assigned Leases.  The entry of the Sale Order and applicable orders of the Bankruptcy Court approving the assignment of the Assigned Contracts and Assigned Leases will effectuate the transfer of each of the Assigned Contracts and Assigned Leases by the Seller to the Purchaser.

(b)     The Seller has provided or otherwise made available to the Purchaser prior to the date of this Agreement true, complete and accurate copies of all material Assigned Contracts and material Assigned Leases, including all material amendments to and assignments of them.

3.8     Benefit Plans.  Other than as set forth on Schedule 3.8, the Seller does not maintain, sponsor, contribute to, or have any obligation to contribute to, or have any liability or potential liability under or with respect to (i) any "multiemployer plan" as defined in Section 3(37) or 4001(a)(3) of ERISA, or (ii) any employee benefit plan, program or arrangement that provides for post-employment medical or health benefits (other than health continuation coverage required by COBRA) and that would result in any obligation or liability to the Purchaser.

**4.     Representations and Warranties of the Purchaser**.  Purchaser represents and warrants to the Seller as of the date hereof (or as otherwise expressly set forth in any provision of this Section 4:

4.1     Organization.  The Purchaser is a limited liability company, duly and validly existing and in good standing under the laws of the State of New York and has all limited liability company power and all material governmental licenses, authorizations, permits, consents and approvals required to carry on its business as now conducted.

4.2     Authorization.  The execution, delivery and performance by the Purchaser of this Agreement and the consummation of the transactions contemplated hereby are within the limited liability company power of the Purchaser and have been duly authorized by all necessary action on the part of the Purchaser.  This Agreement constitutes a valid and binding agreement of the Purchaser that is enforceable in accordance with its terms.

4.3     Noncontravention.  Neither the execution and delivery of this Agreement nor the consummation of the Transactions will (a) conflict with or result in any breach of any provision of the operating agreement of the Purchaser; (b) require any filing with, or the obtaining of any permit, authorization, consent or approval of, any third party or governmental entity; (c) violate, conflict with or result in a default (or any event which, with notice or lapse of time or both, would constitute a default) under, or give rise to any right of termination, cancellation or acceleration under, any of the terms, conditions or provisions of any note, mortgage, other evidence of indebtedness, guarantee, license, agreement, lease or other contract, instrument or obligation to which the Purchaser is a party or by which the Purchaser or any of its assets may be bound; or (d) violate any law, order, injunction or decree applicable to the Purchaser, excluding from the foregoing clauses (b), (c) and (d) such requirements, violations, conflicts, defaults or rights (i) which would not adversely affect the ability of the Purchaser to consummate the Transactions, or (ii) which become applicable as a result of any acts or omissions by, or the status of or any facts pertaining to, the Seller.

4.4     Financing/Adequate Assurance.  The Purchaser has sufficient cash, available lines of credit or other sources of immediately available funds to enable it to make payment of the Purchase Price and any other amounts to be paid by it hereunder.  The Purchaser is capable of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to the Assigned Contracts and Assigned Leases.

4.5     Litigation.  Except as set forth on Schedule 4.5, there is no action, suit, investigation or proceeding pending against or, to the knowledge of the Purchaser, threatened against or affecting the Purchaser before any court or arbitrator or any governmental body, agency or official which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the Transactions.

5.     **Covenants of the Seller.**

The Seller agrees that:

5.1     Conduct of the Business.

(a)     Except as may be required by the Bankruptcy Court, except for the consequences resulting from the commencement and continuation of the Bankruptcy Case, and except as may be required or contemplated by this Agreement, from the date hereof until the earlier of the Closing Date or the date of termination of this Agreement, the Seller shall use its commercially reasonable efforts to conduct the Business in the ordinary course consistent with past practice, including, specifically (i) selling Merchandise during such period at customary prices, (ii) not promoting or advertising any sales or in-store promotions (including POS promotions) to the public other than in the ordinary course of business, and (iii) delivering as much of the Seller's "sold but not delivered" Merchandise to the Seller's customers as is reasonably practicable; provided, however, that, notwithstanding any other provision of this Agreement, the Purchaser recognizes that the financial condition of the Seller requires that the Seller take certain actions outside the ordinary course.  Seller shall be entitled to give notices (or supplement previously issued notices), to the extent applicable, under the WARN Act to employees at any of its locations that may be covered by the WARN Act.

(b)     The Seller shall not:

(i)     conduct any "going out of business," "store closing" or similar themed sale; provided, however, that the foregoing shall not prohibit any such sales to the extent Seller obtains Purchaser's prior written consent for such sale.

(ii)     instruct its employees to alter the Seller's discounting practices of Merchandise from the Seller's discounting practices prior to the date hereof; and the Seller shall not conduct any promotions or advertised sales, except in the ordinary course of business; provided, however, that the foregoing shall not prohibit any such practices or actions to the extent that they are undertaken in connection with any "going out of business," "store closing" or similar themed sale previously approved in writing by Purchaser.

(c)     The Seller shall not, in any material manner, mark up or raise the price of any items of Merchandise, or remove or alter any tickets or any indicia of clearance merchandise other than in the ordinary course of business.

(d)     The Seller shall ticket or mark all items of Merchandise received prior to the Closing Date in a manner consistent with similar Merchandise.

5.2     Access to Information.  From the date hereof until the earlier of the Closing Date or the date of termination of this Agreement, the Seller shall reasonably afford, and shall cause its officers, employees, attorneys and other agents to reasonably afford, to the Purchaser and its counsel, accountants and other representatives, access (at reasonable times during normal business hours) to officers and other employees of the Business for the purposes of evaluating the Acquired Assets and all properties, books, accounts, records and documents of, or relating to, the Acquired Assets.

5.3     Notices of Certain Events.   From the date hereof until the earlier of the Closing Date or the date of termination of this Agreement, the Seller shall promptly notify the Purchaser of:

(a)     any written notice or other written communication from any Person alleging that the consent of such Person is or may be required in any material way in connection with the consummation of the Transactions;

(b)     any material written communication from any governmental or regulatory agency or authority in connection with or relating to the Transactions; and

(c)     the commencement of any action, suits, investigations or proceedings relating to the Seller or the Business that, if pending on the date of this Agreement, would have been required to have been disclosed pursuant to Section 3.4 of this Agreement.

5.4     Intellectual Property.

(a)     From the date hereof to the Closing, the Seller will promptly take any and all actions to protect, secure and maintain the Intellectual Property (other than the federal registration of the trademark, mattress.com, with the U.S. Patent and Trademark Office),

- 17 -

including but not limited to: (i) prosecuting fully any pending applications and/or appeals related thereto, (ii) responding to any notices and office actions, (iii) maintaining registrations and (iv) paying all costs and fees associated therewith.

(b)     From the date hereof to the Closing, the Seller shall not abandon or allow any of Seller's rights in the Intellectual Property to lapse without the Purchaser's prior written approval.

(c)     At any time or from time to time after the Closing, Seller shall at the request of Purchaser, execute and deliver any further instruments or documents and take such further action as Purchaser may reasonably request in order to accomplish the transfer of Seller's right, title and interest in and to the Intellectual Property as contemplated hereby and as set forth in Exhibit C.

## 6.     **Covenants of the Purchaser.**

The Purchaser agrees that:

6.1     Adequate Assurance.  In connection with entry of the Sale Order, the Purchaser shall take any and all actions needed to provide "adequate assurance of future performance" with respect to the Assigned Contracts and Assigned Leases pursuant to Section 365 of the Bankruptcy Code.

6.2     Assumed Obligations.  From and after the Closing Date, the Purchaser shall pay, perform and discharge, promptly when payment or performance is due or required, all of the Assumed Obligations and to execute such documents as reasonably requested by the Seller and the parties to such obligations.

6.3     Returned Goods.

(a)     The Purchaser shall accept returns of and be responsible in any respect for any Merchandise sold by the Seller prior to the Closing Date, and.

(b)     All customer requests for cash refunds or merchandise credits with regard to returned Merchandise shall be processed exclusively through the Purchaser's office, and the Purchaser shall issue any cash refunds or credits to customers in respect of any sale written prior to the Closing Date.

6.4     Notices of Certain Events

From the date hereof until the earlier of the Closing Date or the date of termination of this Agreement, the Purchaser shall promptly notify the Seller of:

(a)     any written notice or other written communication from any Person alleging that the consent of such Person is or may be required in any material way in connection with the consummation of the Transactions;

(b)     any material written communication from any governmental or regulatory agency or authority in connection with or relating to the Transactions; and

(c)     the commencement of any action, suits, investigations or proceedings relating to the Purchaser or the Business that, if pending on the date of this Agreement, would have been required to have been disclosed pursuant to Section 4.5 of this Agreement.

6.5     DIP Loan. From the filing of the Bankruptcy Case through the earlier of the Closing Date or the date of termination of this Agreement, the Purchaser will provide to the Seller the DIP Loan. The Seller may draw down on the DIP Loan from time to time, in its discretion, for use in connection with operating expenses of the Seller generally in accordance with the budget attached as Schedule 6.5 hereto as the same may be supplemented or modified from time to time (the Purchaser acknowledges and agrees that the budget is a pro forma and that certain items within the budget may vary due to the vagaries of the marketplace, and that Seller, in its discretion, may modify the amounts and timing of the various items within the budget so long as the aggregate budgeted amount does not materially increase). The Purchaser will advance the funds to the Seller within one (1) business day of the request therefor.

6.6     Payment of Cure Costs.

Prior to the date on which the Real Property Lease for the Warehouse or a Contract is assigned to the Purchaser, the Seller shall pay, solely out the funds in the Cure Cost Escrow Account, the Cure Costs for the Warehouse or Contract to the landlord for the Warehouse or the other party to the Contract so that no monetary defaults shall remain under the Real Property Lease for the Warehouse or such Contract. The Cure Costs for each Store and Contract are set forth on Schedule 3.7(a). In the event there remains any funds in the Cure Cost Escrow Account after payment of the Cure Costs, the Seller shall direct its counsel to disburse such funds to the Purchaser.

6.7     Employee Obligations

(a)     On or before the Closing Date, Sleepy's, LLC shall in good faith offer full-time employment to substantially all existing employees of Seller as of the Closing Date based on the results of interviews conducted by Sleepy's, LLC with Seller's employees prior to the Closing Date.  Seller agrees to provide Sleepy's, LLC reasonable access to its employees as well as to its personnel files and related documents (to the extent permitted by law) for the purpose of conducting such interviews and determining to which employee's offers of employment will be made.  Sleepy's, LLC shall, consistent with the first sentence of this paragraph make offers of full-time employment prior to the Closing Date to those Seller employees to whom it wishes to offer employment.  The offers shall be in a writing that is substantially similar in form to Exhibit 6.7 to this Agreement.  All Seller employees who receive and accept offers of employment from Sleepy's, LLC prior to the Closing Date and who are terminated from their employment with Seller prior to the Closing Date shall become employees of Sleepy's, LLC as of the Closing Date.  Employees of Seller to whom Sleepy's, LLC does not make offers of employment (and employees of Seller to whom offers are made but are not accepted) shall not become employees of Sleepy's, LLC as of the Closing Date.  All offers of employment shall, at a minimum, be subject to the following terms and conditions: (i) the base

compensation Sleepy's, LLC offers to Seller's employees shall be substantially equivalent to the base compensation currently paid to each of them by Seller (excluding any existing employment or severance related agreements) (to be clear, current salary is the reduced salary being paid by Seller to employees since approximately December 15, 2008), (ii) the employees shall be offered employment at a location reasonably proximate to such employees' place of employment prior to the Closing Date, including the headquarters of Sleepy's, LLC located in Hicksville, NY and Bethpage, NY, and (iii) such employment shall be consistent with the existing policies of Sleepy's, LLC (including its policies regarding vacation and sick time accrual and use), except that, in addition, such employees shall be permitted to carry over and use in accordance with Sleepy's, LLC's policies (only from the date of hire by Sleepy's, LLC through December 31, 2010, unless a longer period of time is required by law) up to a total of three (3) weeks (e.g. 15 days) in the aggregate of vacation, personal and sick time such employees had properly accrued as employees of Seller but had not used as of the date that their employment with Sleepy's, LLC commences, all as disclosed by Seller to Sleepy's, LLC on <u>Schedule 6.7(a)</u> hereto. Nothing expressed or implied in this Agreement is intended to confer upon any employee or his legal representative any rights or remedies, including, without limitation, any rights of employment generally or employment for any specified period, of any nature or kind whatsoever.

(b)     If Seller is liable under the WARN Act due to Sleepy's, LLC's failure to hire a sufficient number of Seller's employees (other than the Excluded Employees), either alone or when aggregated with any earlier employment actions taken by Seller within the relevant WARN Act aggregation period prior to the Closing Date (either 30 or 90 days, as per the WARN Act), then Sleepy's, LLC shall indemnify and hold Seller harmless from and against all resulting WARN Act liabilities. The "<u>Excluded Employees</u>" include (i) any Seller employees who resigned from their employment with Seller at least three (3) days prior to the Closing Date; (ii) any Seller employees whose employment was terminated by the Seller at least three (3) days prior to the Closing Date; and (iii) any Seller employees to whom Sleepy's, LLC offered employment consistent with subsection (a) of this Section 6.7, but who declined such employment. The Excluded Employees do not include any Seller employees who resign or whose employment was terminated by Seller within three (3) days of the Closing Date in furtherance of the sale transaction. For clarification, Sleepy's, LLC must indemnify and hold harmless Seller from WARN Act liabilities only if Seller has WARN Act obligations that are triggered by personnel actions during the relevant period other than those directly related to the Excluded Employees. Seller represents and warrants that on May 5, 2009 it provided WARN Act notices to the Employees listed on Schedule 6.7(b) hereto (in the form annexed thereto) so that, to the Seller's knowledge, no obligation under the WARN Act for notice, compensation, benefits or damages should arise in the event the Closing occurs on or after August 5, 2009 and the Seller terminates at Closing the employment of all Seller employees who have not been offered and accepted employment with the Sleepy's, LLC. In the event that the Closing Date takes place after August 5, 2009 and/or Seller does not terminate until after that date the employment of the employees who have not been offered and accepted employment with the Sleepy's, LLC, then Seller agrees to cooperate with Sleepy's, LLC to issue any additional notices Sleepy's, LLC determines in its discretion should be issued to Seller's employees to comply with the WARN Act.

(c)     From and after the Closing Date, Sleepy's, LLC shall assume the COBRA obligations of the Seller as a successor employer (as defined under Treas. Regs. § 54.4980B-9,

Q&A-8(c)(1)) with respect to all M&A qualified beneficiaries (as defined under Treas. Regs. § 54.4980B-9, Q&A-4(a)) under those Plans specifically listed on Schedule 6.7(c). Notwithstanding anything stated herein, the parties acknowledge that Sleepy's, LLC is not a successor for any other employment or labor law purposes, or any other purposes whatsoever.

(d)     In addition to Sleepy's, LLC's obligations under subsections (a), (b) and (c) of this Section 6.7, Sleepy's, LLC shall, consistent with the last two sentences of this paragraph (d), pay all obligations of Seller related to all Employee Claims, but only to the extent such Employee Claims exceed the Employee Claims Threshold (such excess amount above the Employee Claims Threshold, the "Excess"). Notwithstanding anything contained herein to the contrary, the foregoing shall be subject to Seller's obligation (with respect to which obligation Seller hereby expressly agrees) to (a) review in good faith any such claims by any such present or former employees and to contest or cause to be contested in good faith any such claims by any such present or former employees, where appropriate or with respect to which it may reasonably be determined by Seller (or its successors) that the acts, omissions, agreements, circumstances or transactions giving rise to any such claims may comprise or be deemed to be fraudulent transfers, transfers of rights or assets on account of antecedent debt or preferential transfers (collectively, "Transfers"), or with respect to which it may reasonably be determined by Seller (or its successors) that any such claims arise/arose out of or result/resulted from acts/omissions of Seller or any of Seller's officers, directors, agents, employees or principals in breach or violation of any fiduciary or other duties owing to Seller or to any of its creditors or equity holders (collectively, "Violations"), and (b) obtain either (i) the written consent of Purchaser for allowance of any Employee Claim that is disputed by Seller (or its successors) or the Committee, that is in excess of $15,000, or (ii) Bankruptcy Court approval of allowance of an Employee Claim that is disputed by Seller (or its successors) or the Committee, that is in excess of $15,000, which all parties hereto agree may be contested by Sleepy's, LLC or the Purchaser. Any amounts finally determined by the Bankruptcy Court to constitute Transfers or Violations shall not be counted as an Employee Claim for the purposes of calculating the Excess. In the event that the Employee Claims exceed the Employee Claims Threshold, Sleepy's, LLC shall pay to Seller an additional amount in cash equal to the 84.9% of the Excess up to the Employee Claims Limit. Purchaser and Sleepy's, LLC shall have no obligation to reimburse Seller for any Employee Claims in excess of the Employee Claims Limit.

(e)     Sleepy's, LLC agrees to reimburse Seller for all amounts to which Seller is so entitled to recover from Sleepy's, LLC under subsections (b), (c) and (d) of this Section 6.7 (the "Employee Obligations"), not later than 15 days prior to any distribution date or dates on which any distributions related to Employee Claims are to be made in the Bankruptcy Case or otherwise, if not previously paid as set forth herein.

(f)     Seller represents and warrants that it was not a party to any collective bargaining agreement, has not recognized any labor union as the representative of its employees and has not within the past year been subject of a demand by a union for recognition or a petition for representative status before the National Labor Relations Board.

7.     **Covenants of the Purchaser and the Seller.**